EnergyNorth v. Underwriters, et al.   CV-97-064-M   06/14/02
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


EnergyNorth Natural Gas, Inc.,
      Plaintiff
      v.                                    Civil No. 97-064-M
Underwriters at Lloyd's,
      Defendant

                                           Opinion No. 2002 DNH 118


EnergyNorth Natural Gas, Inc.,
      Plaintiff
      v.                                    Civil No. 99-049-M
Utica Mutual Insurance Company;
St. Paul Fire & Marine Insurance Co.;
Northern Assurance Company of America;
Underwriters at Lloyd's;
Century Indemnity Company; and
American Re-Insurance Company,
      Defendants


                      **O R D E R**


      Plaintiff, EnergyNorth Natural Gas, Inc. ("ENGI"), has filed
several suits in state and federal court seeking declaratory
judgment relative to environmental pollution coverage claims
under "accident" and "occurrence" based insurance policies issued
over the years to it or its predecessors.  The suits relate to
different manufactured gas plant ("MGP") sites around New
Hampshire for which ENGI is legally responsible.  These are two
of those suits.

**Background**

A similar ENGI coverage suit, brought in state court, ended recently when summary judgment was entered in favor of the defendant insurer.  That judgment was affirmed by the New Hampshire Supreme Court.  EnergyNorth Natural Gas, Inc. v. Continental Insurance Company, 146 N.H. 156 (2001).

In Continental, the court held that ENGI's conduct (or, more specifically, that of its predecessors) in dumping, or otherwise intentionally discharging toxic waste by-products of gas manufacturing to the environment, met the objective "inherently injurious acts" test.  Accordingly, the court held that resulting property damage was not covered under the "accident" or "occurrence" based policies at issue because, as a matter of state law, an insured's intentional act cannot qualify as an accident "when it is so inherently injurious that 'it cannot be performed without a certainty that some injury will result.'" Id. at 162 (quoting Providence Mutual Fire Ins. Co. v. Scanlon, 138 N.H. 301, 306 (1994)).[1]

_____

[1]    The court noted that, "since an 'occurrence' is defined in terms of an 'accident' . . ., it is apparent that to obtain coverage under either the accident-based or the occurrence-based

Following the supreme court's opinion in <u>Continental</u>, this court directed ENGI to submit a legal memorandum in each of these cases showing cause why the complaints should not be dismissed for failure to state a claim or, in the alternative, why judgment should not be entered in favor of the defendant insurers on grounds that, as a matter of state law, "any injury to property caused by the manufactured gas plant's normal by-product waste disposal activity cannot qualify as either an 'accident' or an 'occurrence,' as those terms are used in the accident and occurrence based policies at issue in this litigation." <u>Energy North Natural Gas, Inc. v. Utica Mutual Insurance Co.</u>, No. 99-049-M, slip op. (D.N.H. March 22, 2001); <u>see also</u> <u>ENGI v. Underwriters at Lloyd's</u>, No. C-97-064-M, slip op. (D.N.H. March 21, 2001). ENGI complied and defendants filed responsive memoranda. Thereafter, the court conducted a hearing at which the parties presented oral argument in support of their respective positions.

policies, injury must have been caused by an accident." <u>Id.</u>, at 158 (citation and internal quotation marks omitted).

3

**Discussion**

In these pending cases (Nos. C-97-064-M and C-99-049-M), ENGI's complaints assert claims that are substantively identical to those that were resolved against it in Continental. Here, as in Continental, ENGI says that it is the successor in interest to companies that, during the same time period as that addressed in Continental, manufactured gas at various sites in New Hampshire; that the waste by-products generated in the ordinary course of that process were hazardous substances (e.g., Polyaromatic Hydrocarbons, tar, emulsions, light oils, etc.); that those waste by-products have been detected in the soils and ground water at the respective sites, as well as in contiguous property and waterways (e.g., the Nashua and Winnipesaukee Rivers); that ENGI has been advised by governmental agencies of its potential liability for remediation costs based upon allegations that the environmental damage resulted from conduct that was "necessary and incidental" to the business conducted by ENGI's predecessors at the respective sites (gas manufacturing); that ENGI is or may become liable for money damages to cover remediation costs; and that the insurance policies at issue provide ENGI with coverage

4

because the pollution damage was caused by one or more "occurrences" or "accidents."

I.    ENGI's Complaints Fail to State Viable Causes of Action.

Even indulging every reasonable inference helpful to plaintiff's cause, and accepting the facts pled as true, ENGI cannot recover under any viable theory. See generally Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992). The complaints allege little more than that ENGI is, or may be held liable for site remediation costs, as demanded by state and federal environmental agencies, due to operation-related (i.e., "necessary and incidental") discharges of hazardous by-products to the environment. Those potential damages are not covered by the accident and occurrence based insurance policies at issue here because, as pled, the acts resulting in the property damage were, as a matter of state law, inherently injurious (intentional), as determined by the New Hampshire Supreme Court in Continental. So, pollution damage to property resulting from those acts, whether to land, surface water, ground water, or contiguous property, does not come within the meaning of the term "accident" as it is used in the relevant

5

accident and occurrence based insurance policies to describe the extent of liability coverage. Or, stated differently, nothing in the complaints – no facts, no conclusory allegations even – suggests that any event occurred during the relevant policy periods that might qualify as a covered "accident."[2]

Under New Hampshire law, an "accident," for purposes of coverage in these cases, is "an undesigned contingency, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." Continental, 146 N.H. at 160, (quoting Vermont Mutual Ins. Co. v. Malcolm, 128 N.H. 521, 523 (1986)). It has already been resolved against ENGI, also the plaintiff in Continental, that a reasonable MGP operator in ENGI's position during the relevant decades in which MGP wastes were regularly discharged to the environment at the Laconia and Nashua sites, would have known that those waste discharges were certain to cause injury in the nature of property damage. Continental, 146 N.H. at 164. ENGI had a full and fair opportunity to litigate that issue (i.e.,

---

[2] Although ENGI has had ample time and reason to do so, it has made no effort to amend either complaint to allege that some specific cause other than routine operational discharges resulted in the environmental damage at issue.

imputed knowledge of the inherently injurious nature of dumping gas manufacturing wastes) in Continental, and it cannot now dispute, in these cases, that its predecessors' acts in discharging MGP wastes to the environment over the years constituted inherently injurious acts, the consequences of which are not covered by defendants' policies.[3]

As noted, the gravemen of ENGI's complaints is that state and federal environmental agencies assert that the contamination at the sites and adjacent property and rivers was due to "operations that were necessary and incidental to the business conducted by ENGI's predecessor." See, e.g., First Amended Complaint, No. C-99-049-M (document no. 75). Necessary and incidental operations are not "something out of the usual," or "not anticipated," or "not naturally to be expected." That is, property damage from necessary and incidental operations that were inherently injurious is not "accidental."

---

[3] Under New Hampshire law, the doctrine of collateral estoppel "precludes the relitigation by a party in a later action of any matter actually litigated in a prior action in which he or someone in privity with him was a party." In re Alfred P., 126 N.H. 628, 629 (1985)(citation omitted). See also Appeal of Manchester Transit Authority, 146 N.H. 454 (2001).

A.    The Facts Pled Fail to State Viable Claims.

"[A] complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Gorski v. N.H. Department of Corrections, ___ F.3d ___, 2002 WL 1021038 (1st Cir. May 24, 2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)) (emphasis added). "The factual allegations of the complaint are to be accepted as true, and all reasonable inferences that might be drawn from them are indulged in favor of the pleader." Id. (citations omitted).

Under that test, the complaints in these cases fail to state claims upon which relief can be granted. First, at best they assert pass-through claims based on regulatory agency allegations of contamination arising from "necessary and incidental" operations at MGPs which, under Continental, were "inherently injurious." Consequently, they do not describe covered "accidents" within the meaning of the applicable policies. Second, no facts or circumstances are pled in either complaint which, if true, could qualify as a covered "accident." Third,

8

even construing the complaints exceedingly generously – as plaintiff itself would construe its own allegations – the complaints still do not plead any "accidents" that would give rise to coverage under the policies at issue.

B.   Even Crediting As True Those Facts ENGI Now Asserts, But Did Not Allege in the Complaints, it Fails to State Viable Claims.

As to the last point, ENGI says that while damage resulting from historical dumping of hazardous wastes into tar ponds or effluent streams that eventually reached ground water and rivers may well not be covered, given the Continental decision, it is, nevertheless, possible that over the years some pollutant discharges and concomitant damage occurred at these sites as a result of discrete accidents. That type of damage, ENGI says, is also pled (albeit implicitly) in its complaints. ENGI argues that, as phrased, each complaint seeks insurance coverage for all property damage resulting from hazardous waste discharges, which would include coverage for discrete accidental injury. Surely, argues ENGI, there can be no reasonable dispute that some contamination at the sites was due in part to "accidents" within the meaning of the policies. In support of that position ENGI

9

points to events like a 1936 flood at the Nashua plant, or the likelihood of an occasional unexpected pipe leak, an unintended spill, or the unintended rupturing of a waste holding tank during decommissioning, resulting in toxic releases at each site distinct from operational discharges in effluent streams or to storage ponds.

But even accepting ENGI's complaints as fairly pleading discrete accidental events during the decades of MGP operations, they still fail. The parties do not directly address the precise issue that arises, but it is not one of first impression. The question raised by ENGI's argument is this: Does an accident-based or occurrence-based liability policy cover property damage caused by discrete accidental hazardous waste discharges where the insured has, for a lengthy period of time, purposefully and regularly carried on operations involving continuous gradual pollution of the same site? The answer is, ordinarily, "no."

10

In Lumbermens Mut. Casualty Co. v. Belleville Indus. Inc., 938 F.2d 1423 (1st Cir. 1991), the court of appeals confronted a very similar issue under Massachusetts law, holding that the occasional accidental discharge of pollutants "in the case of a company with a history of contributing over a lengthy period to a gradual accumulation of pollutants" does not bring any part of the overall property damage related to pollution within insurance coverage for accidents. Id., at 1428.[4] In support of that conclusion, the court identified a number of reasons why accidental coverage was unavailable under such circumstances, such as the infeasibility of attempting to microanalyze the relative contributions to the overall property damage caused by occasional accidental releases, and the difficulty of categorizing litigable fringe events as either "expected" or "unexpected" (i.e., "a catastrophic tropical storm," a fire, spills in transferring wastes to storage tanks, employees tripping and spilling oil, a pipe break, etc.). "[I]n the case

_____

[4] The specific coverage provision at issue in Lumbermens was a "sudden and accidental" exception to a pollution exclusion clause. Here, as in Continental, it is presumed, in ENGI's favor, that the "accidental" coverage trigger does not require a "sudden" event. So the issues presented here and in Lumbermens are identical: Is there coverage for accidental spills when the insured's history is one of intentional polluting discharges of the same type at the same site?

11

of a pollution-prone operation, where the emission of pollutants is part and parcel of the daily conduct of business, there is the possibility of infinite variations on the usual theme; i.e., polluting incidents are likely to occur that are on the fringe of normal operations but that the company seeks to characterize as sudden and accidental." Id.

In short, the court found it inappropriate to microanalyze "a continuous pattern of pollution" in an effort to "distinguish between virtually indistinguishable occurrences," id., in a search for partial coverage when the "nature of an insured's enterprise" and its "historical operations" involved the "discharg[e] [of] pollutants as an ordinary part of its business operations." Id., at 1430. If such discrete "accidents" could trigger accidental property damage coverage under such circumstances, the court of appeals observed, "the result would be that of a very small tail wagging a very large dog." Id., at 1429.

Here, even if it were possible to read ENGI's complaints to cover the allegations they say are included (i.e., discrete,

12

fringe spills or releases qualifying as "accidents"), they still do not state viable claims for coverage because the type of "accident" ENGI says it has alleged in its complaints would not, generally speaking, trigger coverage under the circumstances pled. To borrow the appellate court's metaphor, ENGI would, at the very least, have to plead a very large tail. It has not done so.


II. Even if ENGI's Complaints Could be Read to State Viable Claims, Defendants Are Probably Entitled to Judgment as a Matter of Law.

Even assuming a construction satisfying minimal pleading requirements could be teased from these complaints, defendants would probably still be entitled to judgment. Discovery is complete in C-97-064-M (Laconia) but only partially complete in C-99-049-M (Nashua) because discovery was stayed. Nevertheless, in light of Continental, ENGI was directed to show cause in each case not only why the complaints should not be dismissed for failure to state a claim, but also why judgment should not be entered in favor of defendants, given what seem to be undisputed material facts.

13

ENGI does not contest (not seriously anyway) that hazardous waste by-products of its manufacturing operations were routinely discharged to the environment at each site in the ordinary course, over a lengthy period of time. While it hints at reviving arguments it unsuccessfully made in Continental (i.e., it did not intend to cause environmental damage; tar ponds and effluent discharge streams were customary and socially acceptable at the time; it was not "disposing" but reclaiming wastes for reuse when placing them in unlined holding ponds; etc.), ENGI does not, and cannot in good faith, challenge the essential fact that MGPs at each site historically discharged hazardous wastes to the environment as part of normal operations over a long period of time.[5]

---

[5] See, e.g., ENGI Answers to Interrogatory No. 7, 8, 10, 12, Exhibits to Memorandum, § 4 (document no. 141), C-99-049-M:

> ENGI understands that the normal operations of MGPs of this type could result in discharges of materials into the environment. Additionally, leaks and losses were possible from tanks and pipes. ENGI also understands that some MGP residuals may have been released at an off-site location and/or into site ground water, surface water and soil as a result of plant decommissioning, which ENGI believes took place in the 1960s.

*   *   *

Based upon discovery conducted in other coverage

ENGI has pointed to nothing in either record that might give rise to coverage for a discrete, identifiable, segregable "accident" related to pollution releases at either site. While it insists that additional discovery in the Nashua case (No. C-99-049-M) might turn up evidence of accidents during a period covered by the policies, it does not suggest what those might be, beyond pointing to the existence of "fringe events" like occasional spills by employees, or leaking pipes, or unexpected flooding. See Lumbermens Mutual Casualty Co., supra. (Of course, by additional discovery, ENGI does not necessarily mean discovery from the defendant insurers, but, instead, discovery aimed at assisting its already lengthy investigation into historical events occurring during its predecessors' ownership and operation of the MGPs.)

_____

litigation involving ENGI and these defendants, ENGI has come to understand that at least some of the contamination at the former Nashua MGP may have resulted from discharges of MGP wastes which were entirely legal and accepted practices during the periods in which the MGP operated. . . . [D]uring the entire period of time the Nashua MGP operated, it was acceptable and appropriate for its operators to discharge effluent to the adjacent Nashua River . . . . [i]t is also ENGI's understanding that it was accepted practice during this era to manage demolition wastes on site, including discharges of effluent to adjacent waterways.

15

Accepting ENGI's argument that evidence exists, or could be obtained, to support its assertions that pipes leaked, employees tripped and spilled wastes, floods and hurricanes exacerbated or contributed to contamination of the site(s), and storage tanks ruptured during decommissioning, releasing additional pollutants at the site, still, given the nature of the MGP enterprises and history of inherently injurious (i.e., intentional) hazardous waste discharges, pollution damage coverage related to these sites will not likely be afforded under these policies, as a matter of New Hampshire law. But, the final bell has not yet rung.

III. <u>The Changed Legal Landscape and Status of These Cases</u>.

Retrospective criticism of ENGI's complaints is probably not entirely fair since they were drafted pre-<u>Continental</u> and, at the time, were fairly ordinary, broad invocations of coverage. That is particularly true in light of the absence of clearly developed "trigger of coverage" law in New Hampshire with regard to environmental pollution cases. (Why ENGI has made no attempt to amend the complaints since <u>Continental</u> is not entirely clear, but

is likely due to its inability to make the requisite allegations consistently with Fed. R. Civ. P. 11.)

In any event, <u>Continental</u> has had, and will no doubt continue to have, far-reaching consequences relative to pollution remediation in New Hampshire.  It is perhaps premature, however, to read too much into <u>Continental's</u> seemingly broad reach.  The supreme court did not, for example, explicitly rule out the possibility of "accident" coverage at MGP sites for any and every discrete accidental discharge.  To be sure, property damage occasioned by ordinary operations and routine by-product discharges cannot qualify for coverage under accident or occurrence policies.  And, New Hampshire would likely follow Massachusetts in ruling out coverage for fringe discharges that could be anticipated and that do not significantly or identifiably alter the degree or character of the property damage caused by years of intentional dumping.

But, Massachusetts law also recognizes that even in pollution-prone industries, like MGP operations, 'evidence of a subsequent unexpected and abrupt release of a <u>significant</u> <u>amount</u>

17

of pollutants into the environment may sometimes defeat the insurer's motion for summary judgment" based on a <u>Continental</u> non-accident or non-occurrence argument. <u>Millipore Corp. v. Travelers Indem. Co.</u>, 115 F.3d 21, 33 (1st Cir. 1997)(emphasis added). The test for coverage under such circumstances has been held to be "whether the triggering event is 'so beyond the pale of reasonable expectation as to be considered 'accidental.'" <u>Id.</u> (quoting <u>Highlands Ins. Co. v. Aerovux, Inc.</u>, 676 N.E.2d 801, 806 n.10 (Mass. 1997)). Of course, "the insured must bear the burden of proving that the contamination was caused by [an] . . . accidental release." <u>Id.</u> (quoting <u>Aerovux</u>, 676 N.E.2d at 805).

New Hampshire would likely follow that lead and recognize the bare possibility of coverage under accident or occurrence based policies, where a demonstrably distinct and unexpected accidental discharge of pollutants caused an appreciable amount of identifiable damage (i.e., more than de minimus), at a site long polluted by intentional discharges.

Given that bare possibility, and ENGI's insistence that it has evidence of discrete accidents, here, as in <u>Millipore</u>, the

18

better and fairer outcome at this point is to permit the parties
to make new submissions, if they wish, in light of the
significant intervening decision in Continental.  See Millipore,
115 F.3d at 34.[6]  While nothing in the record suggests it can do
so, ENGI ought to be afforded an opportunity to present what it
can relative to coverage – that is, qualifying accidental
environmental damage at each site.

ENGI shall, initially, amend its complaints to describe
cognizable causes of action under applicable state law, as it
currently stands, giving fair notice to defendants as to what it
claims by way of qualifying discrete accidents or occurrences,
provided, of course, that it can do so consistently with Fed. R.
Civ. P. 11.  Failure to amend to state cognizable claims will
result in dismissal of the current complaints for the reasons
given above.

---

[6] Given the factual realities in each case, and the rather
bleak prospects for ENGI under Continental and the standards
described in this order, rational business considerations may
counsel against bearing additional significant litigation
expenses and attorneys' fees chasing what will likely prove to be
uninsured events.  And, of course, even if a qualifying accident
or two might be found, continued litigation expenses may well
exceed by multiples the comparatively small amount of damage ENGI
would even be able to prove beyond that caused by its inherently
injurious conduct in dumping wastes.

19

The defendant insurers may file motions for summary judgment in each case within thirty (30) days after amended complaints are filed, based upon controlling state law. Dispositive motions by the insurers should, of course, provide evidence of the nature and duration of alleged inherently injurious acts by ENGI resulting in pollution damage at the sites, and the nature and extent of that damage. To survive summary judgment ENGI must present evidence raising a genuine material issue of fact as to whether discrete, non-fringe, accidental discharges of pollutants occurred, during relevant policy periods, that caused an identifiable and appreciable amount of damage beyond that occasioned by its inherently injurious acts over the years, for which it is being held liable.

Discovery is complete in the Laconia case. While discovery in the Nashua case is stayed in this court, discovery related to that site has been ongoing in the parallel state case. Therefore, ENGI should be able to respond quickly in both cases. It has, after all, been investigating each site for years, and by this point is certainly in a position to know whether a qualifying accident occurred. Should ENGI decide to move for

relief under Fed. R. Civ. P. 56(f) in the Nashua case, it will be held strictly to the applicable standards, as the court will be vigilant in guarding against perpetuation of this litigation merely for the sake of keeping faint hopes for coverage alive.

## Conclusion

While ENGI has not shown cause as directed, nevertheless, given the dramatic change in, or clarification of, applicable state law relative to MGP operations and resulting site pollution, the parties ought to be afforded the opportunity to clarify their respective positions in an orderly procedure under the rules announced in <u>Continental</u>. ENGI shall amend its complaints to state causes of action cognizable under applicable state law, as it currently stands, within fourteen (14) days of the date of this order, if it can do so in good faith.

Within thirty (30) days of the filing of amended complaints, the defendant insurers may file appropriate and well-supported dispositive motions.

Within thirty (30) days thereafter, ENGI shall respond to any dispositive motions filed by the defendant insurers.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 14, 2002

cc:  Bruce W. Felmly, Esq.
     Doreen F. Connor, Esq.
     Robert P. Firriolo, Esq.
     Edmund J. Boutin, Esq.
     Robert J. Bates, Jr., Esq.
     Eric A. Kane, Esq.
     Jeffrey P. Heppard, Esq.
     Charles P. Bauer, Esq.
     John D. Frumer, Esq.
     Michael F. Aylward, Esq.
     Kevin E. Buchholz, Esq.