EnergyNorth v. Lloyd's, et al.        CV-97-064-M    03/13/03
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW HAMPSHIRE


EnergyNorth Natural Gas, Inc.,
      Plaintiff
      v.                                  Civil No. 97-064-M
Underwriters at Lloyd's,
      Defendant


                                          Opinion No. 2003 DNH 038


EnergyNorth Natural Gas, Inc.,
      Plaintiff
      v.                                  Civil No. 99-049-M
Utica Mutual Insurance Company;
St. Paul Fire & Marine Insurance Co.;
Northern Assurance Company of America;
Underwriters at Lloyd's;
Insurance Company of North America;
Indemnity Insurance Company of North America;
and Century Indemnity Company,
      Defendants


                        **O R D E R**


                        **Background**

     As discussed in prior orders, EnergyNorth Natural Gas, Inc.

("EnergyNorth") is pursuing a number of suits in both federal and

state courts seeking insurance coverage, under "accident" and

"occurrence" general liability policies, for environmental

pollution clean-up costs imposed upon it by governmental

authorities.  The suits involve pollution damage to property at

several different manufactured gas plant ("MGP") sites in New

Hampshire for which EnergyNorth is legally responsible.  These are two of those cases.

A similar suit, brought in state court, ended when summary judgment in favor of the defendant insurer was affirmed by the New Hampshire Supreme Court.  EnergyNorth Natural Gas, Inc. v. Continental Ins. Co., 146 N.H. 156 (2001).  The court held in Continental that, under New Hampshire law, EnergyNorth's (or, its predecessors') deliberate discharge of toxic wastes from gas manufacturing operations to the environment qualified as "inherently injurious acts."  Id. at 165.  Because an insured's intentional act cannot qualify as an accident "when it is so inherently injurious that 'it cannot be performed without a certainty that some injury will result,'" the court held that pollution damage from deliberate discharges was not covered under the "accident" or "occurrence" policies at issue.  Id. at 162 (quoting Providence Mut. Fire Ins. Co. v. Scanlon, 138 N.H. 301, 306 (1994)).  In addition, the court noted that "since an 'occurrence' is defined in terms of an 'accident' . . ., it is apparent that to obtain coverage under either the accident-based or the occurrence-based policies injury must have been caused by

2

an accident." Id. at 158 (citation and internal quotation marks omitted).

In light of Continental, this court directed EnergyNorth to show cause why the complaints in these cases should not be dismissed for failure to state a viable claim. Although EnergyNorth fell short in that effort, nevertheless, this court afforded it an opportunity to amend its complaints to plead around the exclusion described in Continental, if it could do so in good faith. See, e.g., Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 34 (1st Cir. 1997) ("[W]e think the better, fairer outcome is to permit the parties to make new submissions, if they wish, in light of the significant intervening clarification of the law.") (citations omitted). That is, EnergyNorth was directed to give fair notice to the defendant insurers of just what is being claimed with regard to qualifying discrete accidents or occurrences, (i.e., events not qualifying as inherently injurious acts) during the respective policy periods, that might trigger coverage.

EnergyNorth took advantage of that opportunity and filed amended complaints, albeit under protest. The defendant insurers promptly moved to dismiss those amended complaints as well, for failure to state a viable claim, given the holding in Continental.

With regard to identifying specific events EnergyNorth claims to have occurred at the two sites, during applicable policy periods, that might qualify as "accidents" triggering coverage, the complaints are not very clear. A hearing was held on the motions to dismiss, primarily for the purpose of determining just what EnergyNorth was asserting in the amended complaints. Based upon a careful review of each amended complaint, and relying on counsel's oral representations at the hearing in construing the language used, it appears that the amended complaints do pass muster. Accordingly, with reservations noted below, the motions to dismiss (documents 307 and 154, respectively) are necessarily denied.

That determination brings these cases full circle, or, at least, back to that point at which the court resolved to certify

4

to the New Hampshire Supreme Court the fundamental "trigger-of-coverage" question that underlies these cases (i.e., What are New Hampshire's legal rules for determining when an "accident" or "occurrence" happens for pollution damage insurance coverage purposes?). Even accepting that EnergyNorth has adequately met the forgiving notice pleading requirements of the Federal Rules of Civil Procedure, and has asserted enough to avoid dismissal under <u>Continental</u>, it still cannot be determined whether the policies at issue cover the claimed property damage, without first determining what trigger-of-coverage principle New Hampshire law would apply. This court simply cannot resolve that issue, given the conflicting precedent among courts that have addressed it, including this court, and the absence of any definitive ruling by the New Hampshire Supreme Court.

**The Laconia Amended Complaint (Civil No. 97-064-M)**

Without belaboring the matter, the amended complaint pertaining to the Laconia MGP site meets the basic requirements of Fed. R. Civ. P. 8(a), in that it asserts, <u>inter</u> <u>alia</u>, that:

> - "The damage at the Site that ENGI has been required to clean up was <u>predominantly caused by accidental leaks and spills.</u>  <u>That damage is</u>

5

appreciable and identifiable . . . ." Am. Compl. ¶ 16.
(emphasis added).

    - "The primary contaminant at the site is tar
. . . primarily under the gas holders on the
southeastern portion of the Site, and at the location
of the former tar treatment pit on PSNH property."
Am. Compl. ¶ 17.

    - "[M]ost if not all of the soil and groundwater
contamination was caused by unintentional leaks and
spills in and around the gas holders and related pipes,
by leaks from the bottom of the tar treatment pit, and
potentially by inadvertent contamination during
demolition activities in 1952." Am. Compl. ¶ 19.

    - Underground pipe leaks were inadvertent, "might
go undetected . . . for months or years[,] . . . [and]
[j]ust a few tiny drips undetected for the sixty-year
life of this plant, such as from the gas holder
bottoms, would probably have released thousands of
gallons of tar to the environment." Am. Compl. ¶ 24.

    - "The sediment contamination at Opechee Bay was
caused by inadvertent leaks and spills. There is no
evidence of a wastewater stream discharging to Opechee
Bay." Am. Compl. ¶ 29.

During the hearing on September 18, 2002, EnergyNorth's
counsel made it clear that the amended complaint's assertions are
properly read to plead two basic claims: one for coverage for
damage associated with migration of pollutants from the unlined
tar pit, and another for damage associated with migration of
pollutants from underground leaks from the masonry gas holders
(one of which had been converted to act as a tar storage tank).

6

Counsel also made clear that the amended complaint is properly read to plead identifiable accidents within the policy period(s) that caused environmental property damage unrelated to any damage occasioned by intentional disposal. Tr. (document no. 166) at 72. Finally, counsel asserted that the property damage occasioned by leaks associated with the gasholders was separate from and not related to any damage caused by migration from the open tar pit, located on a different part of the site.

Whether EnergyNorth can withstand a properly supported motion for summary judgment, once the trigger-of-coverage issue is resolved, remains to be seen. But, on a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). "[A] complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim . . . only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations'" set forth in the complaint. Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 473 (1st

7

Cir. 2002) (quoting <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984)). Here, given the assertions made, it cannot be said that no relief could be granted on "any set of facts that could be proved consistent with the allegations" in the complaint.

Having said that, however, the court hastens to reiterate comments made at the hearing regarding tar-pit-related property damage. It is highly likely, indeed it is probably inevitable, that property damage associated with the tar pit will prove to be uninsured, as the result of inherently injurious acts, i.e., the deliberate dumping or discharge of toxic MGP wastes into an unlined pit dug into the ground. Those claims will survive, for now, pending review on summary judgment (which will likely establish undisputed facts implicating the <u>Continental</u> holding). That review, however, must await resolution of the trigger-of-coverage issue.

**The Nashua Amended Complaint (Civil No. 99-049-M)**

Similarly, EnergyNorth asserts in its amended complaint relative to the Nashua MGP site that:

8

- "Most, if not all of this [pollution] damage, was unintentionally caused. Am. Compl. ¶ 47.

- "[T]he damage at the Site was predominantly, if not completely, caused by accidental leaks and spills. That damage is appreciable and identifiable based on the evidence and sound scientific principles." Am. Compl. ¶ 26.

- "The groundwater is most heavily contaminated on the site near and downgradient from the areas where gas holder bottoms, tar separators, sumps and tanks were located, thus confirming that inadvertent leaking from these devices caused the contamination." Am. Compl. ¶ 28.

- Tar and related toxic substances inadvertently spilled onto the site and toward the river when the plant was demolished in the early 1970s. Some wastes remained in a relief holder and, when the holder was filled with sand, those wastes spilled onto the site. "This release was limited in time and lasted for at most 'a day or so.'" Am. Compl. ¶ 37.

- A serious flood occurred in 1936, inundating the plant and seriously damaging gas holders, causing substantial amounts of tar and related toxic substances to be released to the environment. Am. Compl. ¶ 38.

As in the Laconia case, EnergyNorth's amended complaint pertaining to the Nashua site sufficiently pleads events that, if true (and if a hospitable trigger-of-coverage theory is available under New Hampshire law), would plainly fall outside the Continental exclusion. The events pled might qualify as "accidents" and "occurrences" as those terms are properly

9

understood.[1]  At least, at this point, EnergyNorth is entitled to present evidence supporting its claims.

The Continental decision did not declare all manufactured gas plant operations to be inherently injurious to property. Rather, the court held that it is the intentional discharge to the environment of known toxic wastes from such operations that qualifies as an inherently injurious act.  And, an inherently injurious act does not constitute as an "accident" for purposes of determining insurance coverage under "occurrence" or "accident" based policies.  EnergyNorth has carefully pled around that exclusion, and notice pleading is all that is required to avoid Rule 12(b)(6) dismissal.  See also Millipore, 115 F.3d at 33 explaining that (under Massachusetts law, even in pollution-prone industries, a subsequent unexpected release of a

---

[1] Under New Hampshire law, an "accident," for purposes of coverage in these cases, is "an undesigned contingency, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." Continental, 146 N.H. at 160, (quoting Vermont Mut. Ins. Co. v. Malcolm, 128 N.H. 521, 523 (1986)).  And, "since an 'occurrence' is defined in terms of an 'accident' . . ., it is apparent that to obtain coverage under either the accident-based or the occurrence-based policies injury must have been caused by an accident."  Id. at 158 (citation and internal quotation omitted).

significant amount of pollutants may qualify for coverage under an accident-based policy).

### Trigger of Coverage and the Need for Certification

While, at least facially, the amended complaints assert releases of pollutants that might qualify as "accidental" for insurance coverage purposes (that is, releases arguably not subject to the "inherently-injurious-act" exclusion), the legal viability of even those claims necessarily depends upon an effective trigger-of-coverage theory - e.g., one encompassing within the definition of "accident" the gradual continuous migration of pollutants through the soil over decades, and particularly during the periods covered by the policies at issue. Other trigger theories may suffice as well, but yet others may completely doom plaintiff's cause.

The various insurance policies at issue in these cases cover intermittent periods beginning in 1958 and ending in January of 1983. Thus, the earliest coverage began some six years after all gas manufacturing operations at both the Laconia and Nashua plants had ceased. There were no spills or leaks, unexpected or

11

otherwise, that occurred after 1958, unless, that is, New Hampshire law would deem continuous migration of pollutants as an ongoing series of discrete "spills" or "leaks."  That remains to be determined.


## Conclusion

The motions to dismiss (documents 307 and 154, respectively) are denied.  The parties, in each case, shall review the attached proposed order of certification to the New Hampshire Supreme Court and, if they desire, file comments or suggested revisions, on or before April 18, 2003.  (It may prove useful, for example, for the parties in each case to stipulate to the operative policy language, since some of the policies required reconstruction.)


**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

March 13, 2003

12

cc: Bruce W. Felmly, Esq.
    Doreen F. Connor, Esq.
    Robert P. Firriolo, Esq.
    Eric A. Kane, Esq.
    Jeffrey P. Heppard, Esq.
    Mary A. Dempsey, Esq.
    Charles P. Bauer, Esq.
    John D. Frumer, Esq.
    Michael F. Aylward, Esq.
    Kevin E. Buchholz, Esq.