NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2015-0233


THOMAS TODD

v.

VERMONT MUTUAL INSURANCE COMPANY & a.

Argued:  November 12, 2015
Opinion Issued:  April 7, 2016


Devine, Millimet & Branch, Professional Association, of Manchester (Donald L. Smith, Thomas Quarles, Jr., and Owen R. Graham on the brief, and Mr. Smith orally), for the petitioner, Thomas Todd.


Primmer Piper Eggleston & Cramer PC, of Manchester (Gary M. Burt and Matthew J. Delude on the brief, and Mr. Burt orally), for respondent Vermont Mutual Insurance Company.


Lewis Brisbois Bisgaard & Smith LLP, of Chicago, Illinois (Perry M. Shorris on the brief and orally), and Boston, Massachusetts (Kip J. Adams on the brief), for respondent Hanover Insurance Company.

CONBOY, J. In this declaratory judgment proceeding, the petitioner, Thomas Todd, appeals an order of the Superior Court (Nicolosi, J.) denying his cross-motions for summary judgment and granting summary judgment in favor of the respondents, Vermont Mutual Insurance Company (Vermont Mutual) and Hanover Insurance Company (Hanover). The trial court ruled that neither respondent had a duty to provide a defense to Todd in a civil stalking action. We affirm.

I.     Background

The summary judgment record reflects the following pertinent facts. Todd, a Massachusetts resident, is a member of the New Hampshire Chapter of the Appalachian Mountain Club (AMC). He has been a member of the AMC's paddling committee since 1989 and was the committee's co-chair in 2009 and 2010. Todd has also served as the AMC's webmaster. The webmaster is "'responsible for maintaining and updating the Chapter website.'"

Sally Leonard is also a member of the AMC's paddling committee. In January 2014, Leonard filed a stalking petition against Todd. See RSA 633:3-a (Supp. 2014). Leonard alleged that Todd "hacked" her computer and broke her vehicle's window after she had voiced her opinion at an AMC meeting that Todd should not be allowed to participate in a paddling committee event "due to his history of aggressive behavior toward females." Leonard further alleged that she was afraid for her well-being.

At all relevant times, Todd was insured under a homeowner's insurance policy and an umbrella liability policy issued to him by Vermont Mutual. After the stalking petition was filed, Todd notified Vermont Mutual of the action and requested that it provide a defense under one or both of the policies. Vermont Mutual informed Todd that it did not believe that either policy covered the allegations in the stalking petition and declined to provide him with a defense.

The AMC was insured by Hanover under an employment practices liability (EPL) policy and a nonprofit directors, officers and organizations liability (D & O) policy. Todd informed the AMC of the stalking petition and requested that it notify Hanover to provide him with a defense. Hanover declined to provide Todd with a defense.

In March 2014, the Circuit Court (Bamberger, J.) held a final hearing on the stalking petition. The court found that Leonard "failed to sustain [her] burden of proof," and, therefore, the court did not issue a restraining order against Todd. Todd incurred approximately $18,000 in attorney's fees and costs in defending against the stalking petition.

In June 2014, Todd filed the present declaratory judgment proceeding, seeking a declaration that Vermont Mutual and Hanover owed a duty to defend

him against the stalking petition and to reimburse him for the attorney's fees and costs incurred in defending against the stalking petition. In addition, he sought attorney's fees and costs for bringing the declaratory judgment proceeding. See RSA 491:22-b (2010).

The parties filed cross-motions for summary judgment. In its motion, Vermont Mutual argued that Massachusetts law governs interpretation of the policies because the policies are Massachusetts policies that were "issued to [Todd,] a Massachusetts resident, to provide insurance coverage for his Massachusetts home." The trial court determined that Vermont Mutual had no obligation to defend Todd against the stalking petition under either Massachusetts or New Hampshire law. The court further found that Hanover had no duty to defend Todd. Accordingly, the court granted the respondents' motions and denied Todd's motions. This appeal followed.

## II.    Standards of Review

"In reviewing the trial court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Bovaird v. N.H. Dep't of Admin. Servs., 166 N.H. 755, 758 (2014) (quotation omitted). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. N. Sec. Ins. Co. v. Connors, 161 N.H. 645, 649 (2011). We review the trial court's application of the law to the facts de novo. Id.

Resolution of this dispute requires us to interpret the language in the relevant insurance policies. Interpretation of an insurance policy is a question of law. Id. Our analysis in interpreting an insurance policy begins with an examination of the insurance policy language. Great Am. Dining v. Philadelphia Indem. Ins. Co., 164 N.H. 612, 616 (2013). We look to the plain and ordinary meaning of the words in context, "and we construe the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole." Id. (quotation omitted). This is an objective standard. Id. "If more than one reasonable interpretation is possible, and an interpretation provides coverage, the policy contains an ambiguity and will be construed against the insurer." Id. (quotation omitted). Pursuant to RSA 491:22-a (2010), the burden of proving lack of insurance coverage is on the insurer.

## III.    The Duty to Defend

An insurer's obligation to defend its insured is determined by whether "the cause of action against the insured alleges sufficient facts in the pleadings

to bring it within the express terms of the policy." N. Sec. Ins. Co., 161 N.H. at 650 (quotation omitted).  In considering whether a duty to defend exists based upon the sufficiency of the pleadings, we consider the reasonable expectations of the insured as to his rights under the policy.  Id.  An insurer's obligation is not merely to defend in cases of perfect declarations, but also in cases in which, by "any reasonable intendment of the pleadings, liability of the insured can be inferred, and neither ambiguity nor inconsistency in the underlying writ can justify escape of the insurer from its obligation to defend."  Id.  In cases of doubt as to whether the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.  Id.

### A.     Vermont Mutual

On appeal, Todd argues that the trial court erred by ruling that he was not entitled to a defense under the Vermont Mutual homeowner's and umbrella liability policies.  Applying both New Hampshire and Massachusetts law, the trial court determined that Vermont Mutual did not owe Todd a duty to defend because the allegations in the stalking petition did not constitute an "occurrence" under either policy.  The court further found that the actions alleged in the petition did not constitute an "offense" under the terms of the umbrella liability policy.

### 1.     Choice of Law

We first turn to the choice of law issue.  Our analysis is confined to the arguments presented by the parties.  Todd contends that Vermont Mutual's duty to defend must be determined based upon New Hampshire law, and not Massachusetts law.  Vermont Mutual maintains that Massachusetts law need only be applied if we determine that the trial court erred in its interpretation of the policies under New Hampshire law.  We hold that the trial court did not err in its interpretation of the policies under New Hampshire law.  Accordingly, we need not conduct a choice of law analysis.  Cf. In the Matter of Muchmore & Jaycox, 159 N.H. 470, 472 (2009) (noting that there was no choice of law issue because parties agreed that New Hampshire law governed).

### 2.     "Occurrence" Under the Homeowner's and Umbrella Liability Policies

We next examine whether the allegations in the stalking petition constituted an "occurrence" under either of the Vermont Mutual policies.  This analysis begins with an examination of the policies' language.  Amica Mut. Ins. Co. v. Mutrie, 167 N.H. 108, 111 (2014).  Under both policies, Vermont Mutual promises to defend an "'insured'" against a suit or a claim for damages caused by an "'occurrence.'"  "Occurrence" is defined in the policies as "an accident" "which results, during the policy period," in bodily injury or property damage. Thus, unless the alleged injury is the result of an accident, there is no

4

"occurrence," and the policies do not provide coverage. The policies do not define the term "accident." Nonetheless, in construing the word "occurrence" in insurance policies with similar language, we have concluded that "accident" means "an undesigned contingency, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." Id. at 112 (quotation omitted).

We have "developed two inquiries to determine whether an insured's act was an accidental cause of injury, one subjective, the other objective." Marikar v. Peerless Ins. Co., 151 N.H. 395, 398 (2004) (quotation omitted). Under these inquiries, "[i]f the insured did not intend to inflict the injury on the victim by his intentional act, and the act was not so inherently injurious that the injury was certain to follow from it, the act as a contributing cause of injury would be regarded as accidental and an 'occurrence.'" Vermont Mut. Ins. Co. v. Malcolm, 128 N.H. 521, 524 (1986) (emphasis added).

As to the first inquiry, we have explained that an insured's act is not an accidental contributing cause of injury when the insured actually intended to cause the injury that results. Marikar, 151 N.H. at 398. This inquiry is subjective, analyzing the actual intent of the insured. Id. Under the second inquiry, an insured's intentional act cannot be accidental when it is so inherently injurious that "it cannot be performed without a certainty that some injury will result." Amica Mut. Ins. Co., 167 N.H. at 112 (quotation omitted). The insured's intent is irrelevant to the inherently injurious test; rather, the analysis is objective and is "conducted from the standpoint of a reasonable person in the position of the insured." Id. (quotation omitted). Our concern in conducting the inherently injurious analysis is with the intentional character of the insured's conduct and its injurious natural consequences. Energynorth Natural Gas v. Continental Ins. Co., 146 N.H. 156, 161 (2001).

Against this framework, we review the allegations in the stalking petition. In the petition, Leonard alleged that, after she had spoken against having Todd participate in a paddling committee event, Todd "hacked" her computer and shattered a window on her vehicle. Because the objective "inherently injurious" inquiry is dispositive, we need not analyze Todd's subjective intent. See Marikar, 151 N.H. at 398 (confining review to objective inquiry because whether alleged conduct was inherently injurious was dispositive). We agree with the trial court that Leonard's allegations describe conduct that is inherently injurious.

"An act is inherently injurious if it is certain to result in some injury, although not necessarily the particular alleged injury." Id. (quotation and brackets omitted). We conclude that hacking another person's computer is certain to result in some injury. The word "hack" means "[t]o surreptitiously break into the computer, network, servers, or database of another person or organization." Black's Law Dictionary 827 (10th ed. 2014). A "hacker" is

5

defined as "[s]omeone who surreptitiously uses or changes the information in another's computer system." Id. A reasonable person in Todd's position would foresee that surreptitiously breaking into another person's computer to use or change the information in the computer system would lead to some injury — whether it be injury to the computer, to the person, or both. See Energynorth Natural Gas, 146 N.H. at 164-65 (holding that plaintiff's "intentional discharge of toxic waste into a body of water was certain to contaminate that body of water" and was, therefore, inherently injurious). Thus, the activity of hacking alleged in the petition cannot be described as accidental.

We reach a similar conclusion with respect to the allegation that Todd shattered a window on Leonard's vehicle. Because the causation of injury to the vehicle itself is inherent in the act of shattering the vehicle's window, it cannot be accidental. Moreover, some degree of the fear Leonard alleged to have suffered is certainly the natural consequence of having her computer hacked and her vehicle's window shattered. See Jespersen v. U.S. Fidelity & Guaranty Co., 131 N.H. 257, 261 (1988) (concluding that some degree of mental and physical distress claimed to be suffered by discharged employee was natural consequence of being discharged).

Todd argues that the trial court erred by failing to consider Vermont Mutual's denial letter, which he claims "establishes that[,] at the time it denied a duty to defend, Vermont Mutual could not determine whether the Petition alleged conduct by [Todd] that was expected or intended to result in injury to" Leonard. Todd, however, offers no evidence that the court failed to consider Vermont Mutual's denial letter. Nonetheless, even if the trial court failed to consider the letter, we find no error as the language in the denial letter is irrelevant to the determination of whether Vermont Mutual had a duty to defend Todd. That determination required only an examination of the allegations in the stalking petition and the express terms of the policies. See N. Sec. Ins. Co., 161 N.H. at 650. A review of the trial court's order establishes that it did just that.

Todd further contends that the trial court erred in finding that his alleged conduct was not accidental because "[n]ot all things that one could consider 'hacking' are inherently injurious, and, without more in the pleading, it was reasonable to conclude [his] actions were potentially harmless." For example, he contends that the alleged hacking could mean that someone else obtained access to his email account and sent inappropriate emails to Leonard or that he sent Leonard an email that she considered inappropriate. The allegation in the petition, however, does not suggest such potentially harmless conduct. Rather, the allegation is that Todd himself hacked Leonard's computer. As explained above, the nature of hacking belies the possibility that such an activity is harmless.

6

### 3. "Offense" Under the Umbrella Liability Policy

We next address whether the trial court erred by determining that the allegations in the stalking petition did not constitute an "offense" under the Vermont Mutual umbrella liability policy. Under this policy, Vermont Mutual promises to "defend an insured against a claim or suit for damages." "Damages" is defined, in relevant part, to mean "personal injury covered by this policy and caused by an offense." The policy defines "'offense'" as "one or more of the following: "false arrest, detention or imprisonment, or malicious prosecution;" "libel, slander, or defamation of character;" or "invasion of private occupancy, wrongful eviction or wrongful entry." (Emphasis added.) The dispute in this case centers upon the meaning of "invasion of private occupancy." The policy does not define "invasion of private occupancy."

Todd argues that the trial court erred by ruling that this phrase unambiguously refers to real property offenses and, therefore, does not encompass hacking. Relying upon Town of Goshen v. Grange Mutual Insurance Company, 120 N.H. 915 (1980), he maintains that the phrase is "ambiguous as a matter of law and does not require a physical invasion of real estate." In Town of Goshen, however, we did not address the issue of whether the phrase "invasion of private occupancy" can reasonably be construed to provide coverage for claims unrelated to real property. See Town of Goshen, 120 N.H. at 917-18.

In Town of Goshen, we examined the phrase "other Invasion of the Right of Private Occupancy" in an insurance policy to determine whether it referred to more than the right to be free from physical intrusions onto land. Id. We concluded that there need not be "an appreciable and tangible interference" with physical property to constitute an "invasion of the right of private occupancy." Id. at 917 (quotation omitted). As a result, we found that the allegations in the underlying complaint concerning the effect of the planning board's actions on the development of the complainant's property, which caused substantial damages and denied the complainant's right to the free enjoyment of his property without due process of law, constituted an "invasion of the right of private occupancy." Id. at 917-18 (quotation omitted). Because we found that the phrase "other Invasion of the Right of Private Occupancy" lacked clarity as to the scope of coverage, we determined that the policy should be construed against the insurance company and in favor of the insured. Id. at 918. We therefore held that the subject endorsement provided coverage for the civil rights violation claims at issue in that case. Id.

Thus, Town of Goshen involved an examination of the relevant policy language in the context of an alleged interference with the use of real property, id. at 917-18, whereas, here, the allegations involve claims relating to an interest in personal property. Although the policy language at issue in this case is similar to the language we construed in Town of Goshen, we conclude

7

that this case is distinguishable because, to the extent that the phrase is ambiguous, when read in the context of this case, it cannot reasonably be interpreted to encompass claims unrelated to real property. See Bartlett v. Commerce Ins. Co., 167 N.H. 521, 531 (2015) (explaining that we will construe an ambiguity against the insurer only "[i]f one of the reasonable meanings of the language favors the policyholder" (quotation omitted)).

As relevant here, the word "occupancy" is defined as "[t]he act, state, or condition of holding, possessing, or residing in or on something; actual possession, residence, or tenancy, esp. of a dwelling or land" and "[t]he act of taking possession of something that has no owner (such as abandoned property) so as to acquire legal ownership." Black's Law Dictionary, supra at 1247. The interpretation of the phrase as encompassing only claims involving real property is supported by its conjunction in the policy provision with the phrases "wrongful eviction" and "wrongful entry." "[E]viction" means "[t]he act or process of legally dispossessing a person of land or rental property." Id. at 673. "[E]ntry" is defined as "[t]he act, right, or privilege of entering real property." Id. at 650. Reading the provision in its entirety, we conclude that the offenses contemplated by the "invasion of private occupancy, wrongful eviction or wrongful entry" provision in the umbrella liability policy constitute offenses against some interest in real property.

Other courts have similarly interpreted analogous language. In Nichols v. Great American Insurance Companies, 215 Cal. Rptr. 416, 421 (Ct. App. 1985), the California Court of Appeal interpreted the phrase "'other invasion of the right of private occupancy'" in a business liability policy to determine whether it covered an action against the insureds for airwave piracy. The insureds argued that the complaint set forth an invasion of the right of private occupancy because it alleged that they had invaded the underlying plaintiff's "exclusive right to 'occupy' a certain microwave channel or frequency." Nichols, 215 Cal. Rptr. at 421. The court rejected this assertion, explaining:

> "Occupancy" ordinarily refers to "the taking and holding possession of real property under a lease or tenancy at will." The association of "occupancy" with real property in the instant case is reinforced by its conjunction with the words "wrongful entry or eviction." "Eviction" is a term almost exclusively associated with real property. We perceive that the "personal injury" contemplated by the business liability policies was the "wrongful entry, eviction or other invasion of the right to private occupancy" relating to some interest in real property.

Id. at 421 (citations omitted); see also Liberty Mut. Ins. v. East Central Oklahoma Elec., 97 F.3d 383, 390-91 (10th Cir. 1996); Red Ball Leasing v. Hartford Acc. & Indem. Co., 915 F.2d 306, 312 (7th Cir. 1990); Waranch v. Gulf Ins. Co., 266 Cal. Rptr. 827, 828-29 (Ct. App. 1990).

8

Todd contends that interpreting the phrase to refer only to interests in real property would be "more appropriate" if the provision defined "offense" as "wrongful eviction, wrongful entry or <u>other</u> invasion of private occupancy." (Quotation omitted.) We are not persuaded. When construing an insurance policy, we look to the plain and ordinary meaning of the policy's words in context and read the policy as a whole from the vantage point of an ordinary person. <u>Great Am. Dining</u>, 164 N.H. at 616, 619. As we have found, when we do so, the policy language referring to "invasion of private occupancy, wrongful eviction or wrongful entry" pertains to claims involving an interest in real property.

Moreover, the cases from other jurisdictions cited by Todd are inapposite because, unlike the claims here, they address claims relating to real property. <u>See</u> <u>City of Glendale v. Nat'l Union Fire Ins. Co.</u>, No. CV–12–380–PHX–BSB, 2013 WL 1296418, at *1, 3-4 (D. Ariz. Mar. 29, 2013) (insured sought declaratory judgment that insurer obligated to defend against claims that insured as landlord interfered with and discriminated against tenant trying to lease out private hangar space causing lost rent, interest, and lost value of business); <u>New Castle County, DE v. National Union Fire Ins.</u>, 243 F.3d 744, 747-48 (3d Cir. 2001) (insured sought declaratory judgment that insurer obligated to defend against action alleging that zoning and permitting decisions denied real estate developer his due process and equal protection rights); <u>Baer v. Western World Ins. Co.</u>, No. 982309F, 2000 WL 33171048, at *1 (Mass. Super. Ct. Dec. 19, 2000) (insured sought coverage for claims against him involving bodily injury from lead poisoning occurring while an individual resided in a property owned by insured). Thus, those cases do not address the question presented here regarding whether the phrase can reasonably be construed to apply more broadly to allegations involving personal property.

Accordingly, given its context in the language of the policy, we conclude that the phrase applies to claims involving an interest in real property. Because the allegation that Todd hacked Leonard's computer does not involve real property, it is not covered by the policy provision at issue. The trial court did not err in determining that Vermont Mutual had no obligation, under the umbrella policy, to defend Todd against the stalking petition.

B.    Hanover

Todd contends that the trial court erred in determining that Hanover was not obligated to provide a defense under either the EPL policy or the D & O policy. The trial court concluded that Todd's alleged actions did not fall within the scope of his employment with the AMC and, therefore, he was not an "insured" under the terms of the EPL policy. As to the D & O policy, the court determined that the conduct alleged in the stalking petition did not constitute a "wrongful act" under the policy terms. We will address Todd's challenges to the trial court's rulings regarding each policy in turn.

9

1.  EPL Policy

Hanover's EPL policy provides that Hanover "will pay on behalf of the 'insureds', all 'loss' which [the insured is] legally obligated to pay because of 'claims' first made against [the insured] during the 'policy period' and reported to [Hanover] in accordance with [section VII of the policy] for any 'wrongful act' to which this insurance applies." The policy defines "insured," in relevant part, as: "Any 'executive' of the 'insured organization' while acting solely within the course and scope of employment with the 'insured organization,'" and "Any past, present or future 'employees' of the 'insured organization' while acting solely within the course and scope of employment with the 'insured organization' . . . ."

Assuming, without deciding, that Todd qualified as an "executive" or "employee" of the AMC, we conclude that the trial court did not err by determining that Todd's alleged conduct of hacking a computer and shattering a vehicle's window did not fall within the course and scope of his employment with the AMC and, therefore, he was not an "'[i]nsured'" under the terms of the EPL policy. We have said that conduct falls within the scope of employment if: "(1) it is of the kind the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the employer." Tessier v. Rockefeller, 162 N.H. 324, 342-43 (2011) (quotation and brackets omitted). Although we have utilized this test in cases involving claims predicated on the doctrine of respondeat superior, see, e.g., id.; Porter v. City of Manchester, 151 N.H. 30, 39-40 (2004), we agree with the trial court that it is instructive here. See Federal Ins. Co. v. Sandusky, No. 4:11-cv-02375, 2013 WL 785269, at *6 (M.D. Pa. Mar. 1, 2013).

In the stalking petition, Leonard alleged that, the morning after speaking out against Todd's participation in an AMC paddling committee event, she "woke up to find [her] computer had been hacked." She further claimed that, the following day, she "woke up to find a window shattered on [her] Jeep." These allegations do not support a conclusion that Todd's alleged actions were of the kind that the AMC employed him to perform as a member of the paddling committee or as a webmaster. Nor is it reasonable to conclude that the alleged actions were performed with a purpose to serve the AMC in either of those roles.

Todd argues that the trial court erred by disregarding a letter sent to him from the AMC suspending him from all activities and operations associated with the AMC pending resolution of the stalking petition. He maintains that the language in the letter stating that his "suspension is to remain in place pending . . . the determination by the AMC regarding the validity of the allegations related to your conduct while participating in club sponsored activities and endeavors" demonstrates that his alleged conduct was within the

10

course and scope of his employment.  (Emphasis added.)  As explained above, however, the question of whether there was a duty to defend requires a court to compare the policy language to the facts pleaded in the underlying suit to see if the claim falls within the express terms of the policy.  See N. Sec. Ins. Co., 161 N.H. at 653.  The AMC letter to Todd was immaterial to this determination.

Nonetheless, relying upon Alvarez v. Coregis Insurance Company, 74 Cal. Rptr. 2d 110 (Ct. App. 1998), Todd contends that the court erred by determining that the alleged acts did not occur while Todd was "acting solely within the course and scope of employment."  In Alvarez, the California Court of Appeal examined whether an insurance company was obligated to defend an employee who was charged with embezzling funds from the insured-employer.  Alvarez, 74 Cal. Rptr. 2d at 111.  The policy at issue provided coverage to insureds "when acting solely within the scope of their duties, office, or employment" for the employer.  Id. at 112 (quotation omitted).  It further provided that the insurer would defend against "claims for damages alleging fraud, dishonesty, criminal acts or omissions, or unlawful profit or advantage." Id. (quotation omitted).  Noting that there was no definition in the policy of the term "acting solely within the scope," the court interpreted the phrase to mean "that the alleged acts of wrongdoing must be connected with the business of the employer."  Id. at 113 (quotation omitted).  The court determined that the insurer had a duty to defend the employee, in part, because the employee was "charged with misusing her position as [the employer's] bookkeeper to embezzle funds.  Ergo, the alleged wrongdoing is clearly within the scope of [the employee's] employment."  Id. at 114.

Relying upon this interpretation, Todd argues that the stalking petition could fairly be read to encompass acts that were connected with the business of the AMC because his relationship with Leonard "derived solely from their joint membership on the Paddling Committee, and because [Leonard] attributed the alleged misconduct to actions that occurred at AMC meetings." Simply because Todd and Leonard's relationship derived solely from their respective membership in the AMC does not render the alleged conduct connected to the business of the AMC.  Nor does Leonard's allegation that Todd's conduct occurred after she spoke out against him participating in a paddling committee event mean that his alleged conduct was connected to the business of the AMC.  Indeed, it could not reasonably be said that hacking a computer and shattering the window on another committee member's vehicle relates to the business of the AMC paddling committee.  Cf. Federal Ins. Co., 2013 WL 785269, at *7 (concluding that defendant's alleged sexual abuse of minors was not actuated by his work as an executive-level employee of insured non-profit organization and, thus, defendant was not acting in his capacity as an employee of non-profit organization; therefore, claims against defendant were not covered by organization's insurance policy).

11

## 2.    D & O Policy

We next address whether the trial court erred by concluding that Hanover had no obligation to defend Todd under the terms of the D & O Policy. Under the D & O policy, Hanover promised to pay a "'loss'" on behalf of each "'insured individual'" for any "'wrongful acts'" to which the insurance applies, except for certain "'loss'" in which the "'insured organization' pays to or on behalf of the 'insured individual['] as indemnification." The policy defines "wrongful act" to mean, in relevant part, "[a]ny actual or alleged act . . . committed or attempted by . . . [a]n 'insured individual' in his or her capacity as an 'insured individual'" or "[a]ny 'personal injury.'" (Emphases added.)

The trial court assumed that Todd was an "insured individual" under the policy, but, nonetheless, ruled that he was not entitled to a defense because the stalking petition could not be read to allege that Todd committed a "wrongful act." The court determined that Todd's "alleged actions were not committed in his capacity as AMC's webmaster or as a member of the paddling committee." It further concluded that the alleged acts did not constitute a "personal injury" as defined in the policy. (Quotation omitted.)

Todd argues that the trial court erred by determining that his alleged conduct was not committed in his capacity as an "insured individual." He contends that, because the allegations suggest that his alleged conduct was done in retaliation for Leonard speaking out against his participation in a paddling committee event, the alleged conduct "arises from and is directly related to [his] membership on the Paddling Committee." We disagree.

In this context, "capacity" is defined as "[t]he role in which one performs an act; esp., someone's job, position, or duty." Black's Law Dictionary, supra at 249. Todd does not dispute the trial court's findings that the paddling committee is "responsible for planning, scheduling and implementing safe paddling and related activities" and that the webmaster is "responsible for maintaining and updating the Chapter website." (Quotations omitted.) Given these responsibilities, it cannot be reasonably concluded that while allegedly hacking Leonard's computer or shattering her vehicle's window Todd was acting in his capacity as webmaster. Neither does the fact that Todd's alleged conduct occurred after Leonard spoke out against him participating in a paddling committee event reasonably support a conclusion that Todd was acting in his capacity as a paddling committee member when he allegedly committed the alleged conduct. See Federal Ins. Co., 2013 WL 785269, at *7 (determining that there was nothing in the record "to support the notion that Defendant's sexual abuse of minors was actuated by a purpose to serve" non-profit organization, or was "'inextricably intertwined'" with insured's role as an executive or employee of organization (quotation omitted)); Sauter ex rel. Sauter v. Houston Cas. Co., 276 P.3d 358, 363 (Wash Ct. App. 2012) (concluding that, although insured's purpose in executing guaranty was to obtain line of credit

for company, "it does not follow that [insured], in so doing, was acting 'in his capacity' as CEO and manager 'on behalf of'" company where facts clearly demonstrated that insured was acting in his personal capacity).

Again relying upon the letter sent to him from the AMC, Todd contends that his alleged actions were committed in his capacity as an "insured individual." As we have explained, however, the letter from the AMC was immaterial to the trial court's determination of whether Hanover had a duty to defend Todd against the stalking petition. See N. Sec. Ins. Co., 161 N.H. at 653. Thus, we conclude that the trial court did not err in determining that Todd's alleged conduct was outside his capacity as an AMC paddling committee member or webmaster.

Finally, with respect to the allegation that he hacked Leonard's computer, Todd argues that the trial court erred in concluding that the hacking did not constitute a "personal injury" as defined in the D & O Policy. Todd maintains that the trial court erred by interpreting the phrase "other invasion of the right of privacy" as referring only to claims involving an interest in real property.

Under the D & O Policy:

"Personal Injury" means any actual or alleged:

1. Defamation of character, libel, slander, or publication of material in violation of a person's right of privacy; or

2. The wrongful entry or eviction or <u>other invasion of the right of privacy</u>; or

3. False arrest, wrongful detention or imprisonment; or

4. Malicious prosecution; or

5. Infringement of copyright or trademark, unauthorized use of title, plagiarism, or misappropriation of advertising ideas.

(Emphasis added.) The policy does not define the phrase "other invasion of the right of privacy" contained in the second definition of "'Personal Injury'" (Definition 2).

Todd argues that, because in <u>Goshen</u> we found the language "other invasion of the right of private occupancy" did not require a physical invasion of real property, and held that language to be ambiguous, we should similarly find the language at issue in this case ambiguous and construe the provision

13

against the insured.  See Goshen, 120 N.H. at 917-18.  As explained, however, Goshen did not address the issue presented in this case — whether such language encompasses claims other than those involving an interest in real property.  Reading the disputed language in the D & O Policy in context, we conclude that it does not.  See Great Am. Dining, 164 N.H. at 625 ("Where disputed terms are not defined in the policy, we construe them in context, and in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." (quotation omitted)).

The "invasion of the right to privacy" phrase in Definition 2 of "personal injury" immediately follows the phrase "wrongful entry or eviction."  As explained above, the words "entry" and "eviction" relate to interests in real property.  See Black's Law Dictionary, supra at 650, 673.  It logically follows that the phrase "other invasion of the right of privacy" is "intended to encompass actions of the same general type as, though not specifically embraced within, 'wrongful entry or eviction.'"  Waranch, 266 Cal. Rptr. at 828-29 (applying principle of ejusdem generis to interpret phrase "[o]ther invasion of the right of private occupancy" (quotations omitted)).  The "other invasion of the right to privacy" phrase "is simply part of a more complete definition of 'personal injury'" contained in Definition 2.  Id. (quotation omitted).  Accordingly, we interpret the phrase "other invasion of the right to privacy" in Definition 2 as relating to claims involving interests in real property.  See Agway, Inc. v. Agway Petroleum Corp., 93-CV-557, 1993 WL 771008, at *20 (N.D. N.Y. Dec. 6, 1993) (interpreting identical phrase as referring to claims involving an invasion of real property).

Todd contends that the act of hacking "requires an invasion of one's home" because "the hacker must send and receive data" and, therefore, the hacker "crosses the threshold of the victim's physical property."  As explained above, however, we do not construe the act of hacking a computer to require the hacker to cross the threshold of the victim's real property.  See Black's Law Dictionary, supra at 827 (defining "hack" and "hacker").  Although a hacker may intrude upon another's personal information as contained on his or her computer, we are not persuaded that this requires a physical invasion of real property so as to fall within the definition of "personal injury" in the D & O Policy.

Accordingly, because Todd was not acting in his capacity as an "insured individual," and computer hacking does not fall within the definition of "personal injury," we agree with the trial court that the allegations in the petition do not constitute a "wrongful act" under the D & O Policy.  We, therefore, conclude that Hanover had no duty to defend Todd.

Affirmed.

DALIANIS, C.J., and LYNN and BASSETT, JJ., concurred.

14